AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
THE UNITED STATES OF AMERICA FOR A SEARCH
OF A DIGITAL DEVICE SEIZED FROM ONE PERSON UNDER RULE 41
THE UNITED STATES OF AMERICA FOR A SEARCH
WARRANT FOR THE CHEEK CELLS/SALIVA OF ONE PERSON
UNDER RULE 41

Case No.  23-SW-262
23-SW-261

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1 (incorporated by reference); See Attachment A-2 (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed  *(identify the person or describe the property to be seized)*:

See Attachment B-1 (incorporated by reference); See Attachment B-2 (incorporated reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |

18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year); 22 D.C. Code §§ 405(c), 4502; and Possession of a Firearm During a Crime of Violence; 22 D.C. Code § 4504 (hereinafter, the "TARGET OFFENSES"); 18 U.S.C. § 933 Trafficking in Firearms.

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Douglas Hain, Detective
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:  8/11/2023

_____
*Judge's signature*

City and state:  Washington, D.C.

G. Michael Harvey
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | ) |
|---|---|
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| THE UNITED STATES OF AMERICA FOR A SEARCH | ) |
| OF A DIGITAL DEVICE SEIZED FROM ONE PERSON UNDER RULE 41 | ) |
| THE UNITED STATES OF AMERICA FOR A SEARCH | ) |
| WARRANT FOR THE CHEEK CELLS/SALIVA OF ONE PERSON | ) |
| UNDER RULE 41 | ) |

Case No.  23-SW-262
                23-SW-261

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A-1 and A-2 (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B-1 and B-2 (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____August 24, 2023_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.  ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____ .
                                                                                                              *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____8/11/2023_____          _____
                                                                                                  *Judge's signature*

City and state:          _____Washington, D.C._____          _____G. Michael Harvey_____
                                                                                          United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br> 23-SW-262; 23-SW-261 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|

     I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

 

                                                  _____
                                                      *Executing officer's signature*

                                                _____
                                                        *Printed name and title*

G. Michael Harvey

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is a black iPhone in a black case. The property is currently being stored at the detective's office, book 2888 page 228, of the Fifth District Police Station located at 1805 Bladensburg Road NE, Washington D.C.

**<u>ATTACHMENT A-2</u>**

*Persons to be searched*

The person to be searched is SAEVE EVANS, DOB: 05/20/1986, PDID: 542-667, who is currently in custody with the Central Detention Facility. The government seeks a sample of his cheek cells/saliva (buccal swab). A photo of SAEVE EVANS is below:



**ATTACHMENT B-1**

*Property to be seized*

All items constituting evidence, fruits, and/or instrumentalities, in whatever form and however stored, relating to the commission of a criminal offense, including Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922 (g)(1); Trafficking in Firearms in violation of 18 U.S.C. § 933; Assaulting a Police Officer (Felony) While Armed in violation of 22 D.C. Code §§ 405(c), 4502; and Possession of a Firearm During a Crime of Violence in violation of 22 D.C. Code § 4504 (the "TARGET OFFENSES"), as described in the search warrant affidavit, including, but not limited to, the following:

   a.  Establishing or documenting the commission of the TARGET OFFENSES;

   b.  Identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

   c.  Reflecting the ownership and use of the item identified in Attachment A-1 by the individual committing the TARGET OFFENSES;

   d.  Documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

   e.  Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one or more of the TARGET OFFENSES;

   f.  Reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided

support in the commission of one or more of the TARGET OFFENSES, to include photographs of illegal firearms or firearms accessories;

g.  Containing photographs or video that would constitute evidence of a violation of the TARGET OFFENSES, to include photographs of illegal firearms or firearms accessories;

h.  Any records and information relating to the possession, purchase, or sale of firearms;

i.  Records and information related to the email addresses, phone numbers, social media, account identifiers used by perpetrators, aiders and abettors, co-conspirators, and accessories after the fact concerning the TARGET OFFENSES;

j.  Evidence of who used, owned, or controlled the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

k.  Evidence of software, or the lack thereof, that would allow others to control the Device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

l.  Evidence of the attachment to the Device of other storage device or similar containers for electronic evidence;

m. Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device;

n.   Evidence of the times the Device was used;

o.   Passwords, encryption keys, and other access device that may be necessary to access the Device;

p.   Documentation and manuals that may be necessary to access the Device or to conduct a forensic examination of the Device;

q.   Records of or information about Internet Protocol addresses used by the Device; and

r.   Records of or information about the Device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

**ATTACHMENT B-2**

*Property to be seized*

All items constituting evidence, fruits, and/or instrumentalities of violations of Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922 (g)(1); Trafficking in Firearms in violation of 18 U.S.C. § 933; Assaulting a Police Officer (Felony) While Armed in violation of 22 D.C. Code §§ 405(c), 4502; and Possession of a Firearm During a Crime of Violence in violation of 22 D.C. Code § 4504 (hereinafter, the "TARGET OFFENSES") by SAEVE EVANS, as described in the search warrant affidavit, including a sample of the deoxyribonucleic acid ("DNA") of the person identified in Attachment A-2 to be collected via buccal or oral swab in accordance with established procedures, and to be analyzed forensically in accordance with the applicable, valid established procedures.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE UNITED STATES OF AMERICA FOR A SEARCH OF A DIGITAL DEVICE SEIZED FROM ONE PERSON UNDER RULE 41 | Case No. 23-SW-262 |
| IN THE MATTER OF THE UNITED STATES OF AMERICA FOR A SEARCH WARRANT FOR THE CHEEK CELLS/SALIVA OF ONE PERSON UNDER RULE 41 | Case No. 23-SW-261 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the following:

   a.   Search of a digital device seized from SAEVE EVANS which is currently in law enforcement possession (hereinafter, the "TARGET DEVICE"), as described in Attachment A-1, and the extraction from that property of electronically stored information as described in Attachment B-1;

   b.   Search of the cheek cells/saliva (buccal swab) of SAEVE EVANS (hereinafter "the buccal swab"), as described in Attachment A-2;

2.      I am a Detective for the Metropolitan Police Department ("MPD"). I am currently assigned to the Fifth District Detective Unit. I have been assigned to work on misdemeanor and felony cases in Washington, DC. In the course of conducting these investigations, I have been involved in the use of multiple investigative techniques such as interviewing cooperating witnesses, conducting physical surveillance, historical cell-site analysis, electronic device forensic

7

analysis, and preparing and executing search and arrest warrants that have led to arrests and seizures of narcotics, firearms, and other contraband.

3.      The facts in this affidavit come from my personal observations, training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience, and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that SAEVE EVANS has committed the TARGET OFFENSES, including Unlawful Possession of a Firearm, in violation of 18 U.S.C. § 922 (g)(1); Trafficking in Firearms in violation of 18 U.S.C. § 933; Assaulting a Police Officer (Felony) While Armed in violation of 22 D.C. Code §§ 405(c), 4502; and Possession of a Firearm During a Crime of Violence in violation of 22 D.C. Code §§ 4504, and that the TARGET DEVICE contain evidence, fruits, or instrumentalities of the commission of the TARGET OFFENSES. There is also probable cause to search the TARGET DEVICE, further described below and in Attachments A-1 for the things described in Attachment B-1.

5.      Based on my training and experience, and the facts set forth in this affidavit, I further submit that there is probable cause to believe that evidence of the TARGET OFFENSES will be found located in the cheek cells/saliva (buccal swab[1]) of SAEVE EVANS. Specifically, a buccal swab from EVANS will be used to test against DNA profiles that are developed from a firearm seized from EVANS's possession on August 1, 2023.

---

[1] As the Supreme Court has recognized, a "buccal swab" is a "common procedure" that involves "wiping a small piece of filter paper or a cotton swab similar to a Q-tip against the inside cheek of an individual's mouth to collect some skin cells." *Maryland v. King*, 133 S. Ct. 1958, 1967–68. This procedure is "quick and painless" and poses "no threat to the health or safety" of a defendant. *Id*. at 1968.

**PROBABLE CAUSE**

6.     On Tuesday, August 1, 2023 at approximately 5:28 a.m. (EST), Officer E.D. with the Fifth District of MPD was dispatched to 1709 Benning Road Northeast, Washington, D.C. in response to sounds of gunshots. Officer E.D. was wearing a full police uniform and driving a marked MPD cruiser.

7.     As explained by Officer E.D., upon arriving to the scene, Officer E.D. spotted an individual, later identified to be Saeve Evans (hereinafter the "Defendant") on the walkway at the side of 1711 Benning Road Northeast, which can be described as a three-story apartment building. Officer E.D. heard the Defendant state, "I know what you are here for," and then something along the lines of "come and get it."  The Defendant then proceeded to fire shots at Officer E.D.  Officer E.D. returned fire and the Defendant retreated into 1711 Benning Road Northeast.  (The same sequence of events can be seen on Officer E.D.'s body worn camera ("BWC") footage. Although the specific words being yelled by the Defendant before he begins shooting at the officer are not discernible in the recording, Officer E.D.'s BWC shows the officer walking up to the area and having something yelled at him from the courtyard where the Defendant is located.  Officer E.D. then yells, "Hey, let me see your hands."  The Defendant then begins shooting multiple times at the officer. Officer E.D. then ducks behind a grey/silver vehicle, yells "shots fired" over the radio, and returns fire.  Officer E.D. then continues to duck behind a vehicle as multiple shots can be heard being fired.  Officer E.D. returned fire again and indicated that there would be a barricade over the radio.)

8.     Additional officers with the Fifth District responded to assist and entered 1711 Benning Road Northeast.  Officers located the Defendant on the third-floor landing of the apartment building.  The Defendant was placed under arrest.  Officers also recovered a firearm

near the Defendant on the same third floor landing, as shown in figure 1.



*Figure 1 shows a still from BWC with a red circle around the firearm.*

9.      The firearm was a black Springfield XD 9x19 pistol with serial number XD226954.  The firearm was equipped with a sixteen (16) round magazine. Both the firearm and magazine had no ammunition in it when it was recovered.  Law enforcement subsequently determined the firearm was stolen on March 9, 2023 from the state of Texas.



*Figure 2 shows the black Springfield XD 9x19 pistol with serial number XD226954.*

10.     There are no firearm or ammunition manufacturers in the District of Columbia and therefore, the firearm and ammunition in this case traveled in interstate commerce.

11.     A criminal history check of the Defendant revealed that he was previously convicted on January 13, 2006 of Receiving Stolen Goods (Felony), and three counts of Assaulting a Police Officer With a Dangerous Weapon in D.C. Superior Court Case Number 2005 FEL 003797.  The Defendant was also convicted on May 17, 2019 of Unlawful Possession of a Firearm (Prior Conviction) in D.C. Superior Court Case Number 2016 CF1 020268.  In both prior cases, the Defendant was sentenced to a period of time greater than one year of imprisonment.  Therefore, the Defendant was aware at the time of his arrest in this case that he had a prior conviction for a crime punishable by more than one year.

12.     MPD officers searched the Defendant incident to arrest. MPD recovered a black iPhone in a black case from the Defendant's front left pocket during the search.

13.     Law enforcement subsequently recovered surveillance footage, including interior and exterior footage from 1711 Benning Road Northeast.  Exterior footage shows the Defendant exiting the building of 1711 Benning Road Northeast with a dog, wearing a black shirt, a black and white scarf, jeans, and black shoes with white soles.  The Defendant proceeds to shoot a firearm in the air, as shown in figure 3.



*Figure 3 shows a still from surveillance video of the Defendant holding a firearm in the air.*

14.     The Defendant then exits the view of the surveillance camera and returns shortly thereafter wearing a white tank top and holding his black shirt and scarf in his hand, as circled in red in figure 4.  By that point, Officer E.D.'s marked MPD cruiser had already pulled up and parked on the street nearby, as circled in yellow in figure 4 below.



*Figure 4 shows a still from surveillance video with the Defendant in the red circle and police car in the yellow circle.*

15.     The Defendant then spots Officer E.D., and proceed to fire multiple times at Officer E.D., as shown in figure 5 below.



*Figure 5 shows a still from surveillance video with the Defendant, identified by the red arrow, firing his gun at Officer E.D., shown by the yellow arrow, who is standing to the right of the silver/grey vehicle.*

16.    Officer E.D. can be seen ducking down behind a vehicle as the Defendant runs into 1711 Benning Road Northeast.  Interior surveillance footage, which captures the steps leading into 1711 Benning Road Northeast, then shows the Defendant continuing to fire upon Officer E.D. while outside of the building, as indicated in figure 6 below.



*Figure 6 shows a still from surveillance video from inside 1711 Benning Road NE with the Defendant, identified by the red arrow, outside the building firing his gun at Officer E.D.*

17.    The Defendant then retreats upstairs to the third floor.  Footage then shows MPD Officers entering the building and exiting with the Defendant.

18.    The Defendant verbally identified himself to the transport officer as SAEVE EVANS with a date of birth of May 20, 1986.  The Defendant was then taken to the hospital for an injured finger and because he claimed that his back hurt and leg was sore.  (The Defendant also later indicated that he fell in the hallway and appeared to some of the officers as having potentially have suffered a concussion.  Officers also observed that the Defendant appeared to possibly be under the influence of some unknown substance.)

19.     Once he was back at the station, Detectives interviewed the Defendant. The Defendant appeared dazed and confused. The Defendant did not know where he was. He did not know he was under arrest. He did not know what day it was and who the president was. Detectives asked him if he had taken any medication or drugs. The Defendant stated that he did not take any. The Defendant then stated that his name was Sabee Holloway and that his date of birth was May 20, 1986. He claimed that he lived at a house on the 1700 block of Rosedale Street Northeast. He had no emergency contact to give Detectives. The Defendant then requested a lawyer and Detectives ended the interview.

20.     CIC Shotspotter detected 2 shots in front of the 1709 Benning, 3 shots in front of 1743 Gales Place NE, another round of 11 shots in front of 1743 Gales Place NE, and two detections at 739 18th Street NE. One detection was for 2 shots, and the other detection was for 3 shots.

21.     Of the vehicles parked in the 1711 Benning Road NE parking lot, two sustained damage. A white Hyundai Elantra sedan bearing DC tag ending in 62 was struck by a bullet in the right rear bumper and exited through the rightmost part of the rear bumper. Also, a blue Dodge bearing DC tags ending in 60 was struck once by a bullet on the right rear passenger door.

22.     Bullets struck the 1711 Benning Road NE front door and third-floor glass panels. Two apartment front doors sustained damage by gunshots.

23.     On August 2, 2023, the Defendant was charged by Criminal Complaint with Felon in Possession, in violation of 18 U.S.C. § 922 (g)(1); Assaulting a Police Officer (Felony) While Armed in violation of 22 D.C. Code §§ 405(c), 4502; and Possession of a Firearm During a Crime of Violence in violation of 22 D.C. Code § 4504.

24.     The Defendant has been unable to appear for two scheduled Initial Appearances

because he could not be brought to the courthouse by the Marshals. The Defendant is scheduled for an Initial Appearance on Friday, August 11, 2023.

## THE BUCCAL SWABS

25.     Through my training and experience, I am familiar with the fact that each person has a unique DNA composition. DNA isolated from blood, hair, skin cells, or other genetic evidence left at the scene of a crime or left on evidence of a crime can be compared with the DNA of an individual to identify an individual as a potential suspect.

26.     The physical evidence, namely the firearm and extended magazine, in this case is currently being stored in the District of Columbia and will be swabbed for potential DNA.

27.     A buccal swab from SAEVE EVANS is needed in order to compare his profile to any interpretable/usable DNA profiles developed from swabs of the firearm and magazine.

28.     SAEVE EVANS is currently in custody in case 23-MJ-00193.  Your affiant will coordinate obtaining the buccal swabs from SAEVE EVANS with the Central Detention Facility.

## IDENTIFICATION OF DEVICE SEIZED

29.     The following DEVICE was recovered from SAEVE EVANS at the time of his arrest:

A.  One (1) black in color iPhone in a black case seized from SAEVE EVANS 's person at 1711 Benning Road, Northeast, Washington D.C.

30.     The TARGET DEVICE was seized by members of the MPD from EVANS and is currently being stored at the detective's office in the Fifth District Station located at 1805 Bladensburg Road NE, Washington, D.C.

**BACKGROUND ON CELLULAR DEVICE**

31.     I have experience investigating the illegal possession of firearms as a violation of state and/or federal law.  I have participated in numerous firearms investigations conducted by MPD. I have experience in debriefing defendants, participants, and various persons with direct experience and knowledge regarding the methods used to possess and/or distribute firearms.  Additionally, I have been involved in the following investigative techniques:  conducting physical surveillance, executing search warrants and arrest warrants which resulted in the seizure of illegal firearms and other contraband.  I have been the affiant on search warrants in other investigations.

32.     Your affiant knows that people who possess firearms like to take pictures of themselves with firearms to prove ownership or possession of a particular firearm to their friends. They will use a camera, cell phone with a camera, tablets with a camera, and/or personal computers to photograph and store photographs of firearms or themselves holding the firearm and other criminal activity that they may be involved in. These pictures or videos are excellent evidence of illegal gun possession. Moreover, cellphones can contain communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.  Such evidence will be more likely in a case such as this one, where the Defendant was not legally allowed to purchase a firearm and thus would have had to purchase it from someone he knew – which is primarily done via online chats or text discussions.

33.     Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images

or video recordings relevant to the criminal activity.  Furthermore, I know from my training and experience that call logs, text messages, emails, and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.

34.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that criminals and/or conspirators and individuals use cell phones, other electronic device, electronic mail ("e-mail"), and social media to conduct their illegal activity, to preserve and distribute photographs and videos in order to memorialize previous illegal activity, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals.  Digital artifacts and copies of these communications will likely remain on the device on which these communications occurred, including the TARGET DEVICE.

35.     There is probable cause to believe that the TARGET DEVICE contains communications relevant to the TARGET OFFENSES and thus of the identities of potential co-conspirators and facilitators. Evidence of prior communications, exchanged videos or images, or voicemails are all relevant evidence that would tend to show violations of the TARGET OFFENSES. Based on my training and experience, I know that witnesses and perpetrators of crime in Washington, D.C. often communicate between and among themselves before, during, and after the crime. They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc. In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime.

36.     In summation, the execution of a search warrant on the TARGET DEVICE would

allow law enforcement to, among other things: (i) identify communications relating to the possession of firearms and communications evidencing the firearms relationship between parties; (ii) provide contact information regarding potential suppliers, customers, and distributors of firearms; (iii) identify meeting locations for the potential commencement of firearms transactions or acquisition of firearms; (iv) identify photographs and videos of firearms and firearms paraphernalia (such as magazines and ammunition). Additionally, evidence from the TARGET DEVICE may yield ownership information, as well as evidence connecting (or not connecting) EVANS to the seized contraband. All of the aforementioned information would further constitute evidence of the commission of the TARGET OFFENSES by EVANS and known and unknown co-conspirators.

## **TECHNICAL TERMS**

37.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following terms and their respective definitions:

b.     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. See 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

19

c.   "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage DEVICE. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

d.   "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing DEVICE (including, but not limited to, central processing units, internal and peripheral storage DEVICE such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage DEVICE); peripheral input/output DEVICE (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners and related communications DEVICE such as cables and connections), as well as any DEVICE, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

e.   "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital device. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending,

receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

   f. A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication device and can be used to access the Internet or other wired or wireless device through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

   g. A GPS navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation device can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

h.   "Computer passwords and data security device" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security device may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security device. Data security hardware may include encryption device, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

i.   "Computer software" means digital information, which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

38.   Based on my training, experience, and research, I know that the TARGET DEVICE has the capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on device of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the TARGET OFFENSES under investigation.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

39.   As described above and in Attachment A-1 and B-1, this application seeks permission to search for information that might be found within the TARGET DEVICE. Based on my knowledge, training, and experience, as well as information related to me by others involved

in this investigation and in the forensic examination of digital device, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B-1 will be stored in the TARGET DEVICE for at least the following reasons:

a. Individuals who engage in criminal activity often use digital device to facilitate illegal activity and to communicate with co-conspirators; to store on digital device, like the device seized in this case, documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; and contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital device, will often "back up" or transfer files from their old digital device to that of their new digital device, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods

of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

40.     As further described in Attachment B-1, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the TARGET OFFENSES, but also for forensic electronic evidence or information that establishes how the TARGET DEVICE was used, the purpose of its use, who used it (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by others involved in this investigation and in the forensic examination of digital device, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in the TARGET DEVICE because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital device can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from

24

the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the device, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates that files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.      Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICE

41.   Based on my knowledge, training, and experience, as well as information related to me by others involved in this investigation and in the forensic examination of digital device, I know that:

a.      Searching a digital device can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital device and software programs in use today. Digital

device – whether, for example, desktop computers, mobile device, or portable storage device – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital device, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching a digital device can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from a digital device also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital device.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software

requires specialized tools and a controlled laboratory environment, and can require substantial time.

        d.      Digital device users can attempt to conceal data within a digital device through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital device, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. A digital device may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed,

encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

        e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile device require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cellular phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        42.      Based on all of the foregoing, I respectfully submit that searching the TARGET DEVICE for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created

challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the TARGET DEVICE. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

43.     In searching for information, records, or evidence, further described in Attachment B-1, law enforcement personnel executing this search warrant will employ the following procedures:

    i.  The digital device, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B-1.

    ii.  The analysis of the contents of the digital device may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of

language contained in such storage areas exist that are related to the subject matter of the investigation.

iii. In searching the digital device, the forensic examiners may examine as much of the contents of the digital device as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B-1. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B-1. Any search techniques or protocols used in searching the contents of the seized digital device will be specifically chosen to identify the specific items to be seized under this warrant.

## CONCLUSION

44.     Based upon the above-referenced facts, your affiant submits that there is probable cause to believe that a buccal swabs taken from SAEVE EVANS as identified in Attachment A-2, may contain evidence that connects SAEVE EVANS to (or excludes him from) the TARGET OFFENSES.

45.     Your affiant further submits that there is probable cause to believe that the TARGET DEVICE (as described in Attachment A-1) contains evidence, fruits, and instrumentalities of the TARGET OFFENSES (as described in Attachment B-1). Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of

Criminal Procedure 41. I further request that the Court permit the search warrant to be executed at any time of day or night given that the TARGET DEVICE is in MPD custody in the District of Columbia.

Respectfully submitted,

Detective Douglas Hain
Metropolitan Police Department

Affidavit submitted by email and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1 and 41(d)(3) on August 11, 2023.

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE